| | | |
|---|---|---|
| RON HARLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00570-RK |
| | ) | |
| ST. CLAIR COUNTY, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This is a civil rights lawsuit brought by Plaintiff Ron Harleman following his June 2, 2024 arrest by deputies with the St. Clair County, Missouri Sheriff's Department.  Before the Court is Defendants' motion for summary judgment.  (Doc. 58.)  The motion is fully briefed.  (Docs. 59, 62.)  After careful consideration and review, and for the reasons explained below, the Court **ORDERS** that Defendants' motion for summary judgment is **GRANTED**.

### Background[1]

On June 2, 2024, St. Clair County Sheriff's Department Deputies Becca Tucker and Justin Crook responded to a call reporting that Plaintiff had verbally threatened Plaintiff's adult step-son, Cotton Wheeler, over the phone.  The deputies learned later that the caller was Baylee Wheeler, Cotton's wife.  The deputies first went to Plaintiff's property to investigate the reported threats but did not locate Plaintiff at that time.  The deputies then made contact with Cotton at his property.

St. Clair County Sheriff Lee Hilty testified at his deposition that shortly before or at the same time Deputy Tucker and Deputy Crook first went to Plaintiff's house to investigate the reported threat, Cotton called him and indicated "that he [i.e., Cotton] was wanting to go out and confront [Plaintiff]" and that Cotton was going to "kick [Plaintiff]'s ass unless you tell me it's a bad idea," which Sheriff Hilty agreed would be a bad idea, and further that Cotton indicated he and Plaintiff had "both threatened each other," and that Cotton "was going to go down" to Plaintiff's residence.  (Doc. 59-4 at 3, Tr. 4:7-5:18.)  Sheriff Hilty testified that he then called

---

[1] Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted facts.  The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

Deputy Crook "to let him know that the Suzie/Ron situation was brewing,"[2] which Sheriff Hilty knew "had been volatile off and on for . . . a month or so." (*Id.* at 5, Tr. 12:13-24.)

During the investigation and after speaking with Cotton and his family members, Deputy Tucker learned that Plaintiff and Cotton had exchanged words earlier in the day when Cotton had called Plaintiff and criticized Plaintiff for not giving his mother, Suzie, enough money. Plaintiff testified at his deposition that during this initial phone call, Cotton Wheeler threatened to "come and shoot my dogs in front of me, cut my throat, and shoot me." (Doc. 59-5 at 16, Tr. 59:23-24.) At the time of their investigation, however, the deputies did not know the nature of any statements Cotton may have made to Plaintiff other than what they were told by Cotton and his family members that Plaintiff had threatened Cotton after Cotton called Plaintiff and criticized him regarding the amount of financial support he provided for Cotton's mother. (Doc. 59-2 at 10, Tr. 30:4-23.)

While the deputies were speaking with Cotton and his family, Cotton received another call from Plaintiff. Deputy Tucker witnessed this phone call in which Plaintiff verbally threatened to kill Cotton, among other threats and graphic language directed towards Cotton.

Suzie told Deputy Tucker that Plaintiff would be at his property and that he was carrying a gun. Deputy Tucker and Deputy Crook then went back to Plaintiff's property. Plaintiff met the deputies on his property, pulling up in a Polaris Ranger side-by-side utility vehicle. (Doc. 59-2 at 13, Tr. 45:3-9; Doc. 59-5 at 12, Tr. 43:5.) Deputy Tucker requested that Plaintiff remove the firearm that was on his hip in a holster and place it in the Polaris Ranger. Plaintiff did not comply but instead touched his gun and told Deputy Tucker "[i]t's fine where it's at." Plaintiff then began yelling that the deputies were trespassing on his property, that they needed a warrant, and that he had a right to carry his firearm. As Deputy Tucker unholstered her gun, Plaintiff reached for his own.[3] Deputy Crook, who had been approaching Plaintiff from behind the Polaris Ranger, "went hands on" with Plaintiff after he instructed Plaintiff to "turn around and put your hands behind your back like you're going to jail," to which Plaintiff responded, "I'm not going to jail."[4] (Doc.

---

[2] "Suzie/Ron" refers to Plaintiff (Ron Harleman) and his then-wife (Suzie Wheeler). Suzie Wheeler is Cotton Wheeler's mother.

[3] It is undisputed that Plaintiff reached for his gun, although he testified he only did so intending to "put [it] up" or to comply with Deputy Tucker's earlier direction. (Doc. 59-5 at 10, Tr. 34:23-35:18.)

[4] At his deposition, Plaintiff testified that he "was never told I was under arrest" and that he "was never arrested." (Doc. 59-5 at 31, Tr. 121:24-25.) Whether or not Deputy Crook told Plaintiff he was under

59-3 at 7, Tr. 21:1-5.)  Both deputies believed that Plaintiff was reaching for his gun.  Plaintiff "started to pull away" when Deputy Crook grabbed Plaintiff's left arm.[5]  (*Id.* at 8, Tr. 22:7-8.) Plaintiff testified that Deputy Crook "jerked me backwards, jerked my other arm around, handcuffed me, and slammed me into the Polaris Ranger."  (Doc. 59-5 at 11, Tr. 40:2-4.)  It is undisputed that Deputy Crook did so to get physical control and to secure Plaintiff in handcuffs.

After Plaintiff was secured in handcuffs, the deputies walked Plaintiff back to Deputy Tucker's vehicle.  The dash camera video shows that after they arrived at Deputy Tucker's vehicle, Deputy Crook began patting Plaintiff down as Plaintiff was leaned up against the side of the vehicle.  Plaintiff began resisting as Deputy Crook tried to remove Plaintiff's phone from his back pocket by placing his hand in or on his back pocket to block Deputy Crook.  The dash camera video shows Plaintiff continuing to resist as Deputy Crook attempted to remove the phone from his back pocket.  Plaintiff testified that he "was trying to get my phone out" because, as he told the deputies, he was "going to call somebody to get you guys under control."  (*Id.* at 11, Tr. 40:5-9.) Plaintiff, who had been facing Deputy Tucker's vehicle with the deputies behind him, then turned himself around to face the deputies.  In response, Deputy Crook physically turned Plaintiff back around to face Deputy Tucker's car by pushing against Plaintiff's right arm, causing Plaintiff's abdomen or chest to push against or into the vehicle.  Plaintiff was then placed into the back of Deputy Tucker's vehicle.[6]

---

arrest, it is undisputed that at this point of their investigation and their interaction with Plaintiff, the deputies moved to secure Plaintiff in handcuffs.

[5] Plaintiff attempts to controvert this fact but only points to deposition testimony discussing circumstances after the deputies had secured Plaintiff in handcuffs and walked him back to Deputy Tucker's patrol car.  (*See* Doc. 59 at 16, ¶ 29 (citing Doc. 59-5 at 11, Tr. 40:21-22).)

[6] Plaintiff testified that Deputy Crook "slammed me into the car face first and chest first and then he drew me back and done it again." (Doc. 59-5 at 11, Tr. 40:14-16.)  The dash camera video does not show Deputy Crook physically pushing Plaintiff against the car twice, but instead only once, in response to Plaintiff physically turning around to face the deputies after resisting Deputy Crook's attempt to remove Plaintiff's phone from Plaintiff's back pocket.  *See also White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017) (where video evidence "wholly contradicts" a plaintiff's testimony describing his arrest, the Court "need not accept [the plaintiff]'s version of the facts"); *Wallingford v. Olson*, 592 F.3d 888, 893 (8th Cir. 2010) (relying on objective video to analyze excessive force claim and noting that "[a]lthough we view the facts and any reasonable inferences in the light most favorable to [the plaintiff], we cannot ignore incontrovertible evidence which clearly contradicts [the plaintiff]'s allegations").

After being placed in Deputy Tucker's patrol vehicle and while in transport to the jail, Plaintiff complained of chest pains and that he was having trouble breathing. Deputy Tucker told Plaintiff to slow down his breathing and rolled down the window. (Doc. 59-2 at 25, Tr. 92:12-22.) Deputy Tucker did not call EMS immediately but transported Plaintiff to the jail. Plaintiff was evaluated by EMT's after arriving at the jail.[7] Plaintiff was transported to the hospital for evaluation because of tachycardia and his reported chest pain. After evaluation in the ER, Plaintiff was admitted for further observation and monitoring because of an "upward trend" in his troponin levels. (*See* Doc. 59-7 at 21, Tr. 76:5-14.) EKG testing showed only an increased heart rate but did not indicate that Plaintiff was having a heart attack. (*Id.*, Tr. 74:1-4.) Plaintiff left the hospital and was released from custody the next morning. Plaintiff was not charged with any crime.

Further facts are set forth as necessary.

### Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In this context, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008). Thus, the relevant inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### Discussion

Plaintiff asserts five claims in this civil rights lawsuit against Defendants St. Clair County, Missouri; Sheriff Hilty; Deputy Tucker; and Deputy Crook. Deputy Tucker and Deputy Crook are sued in both their individual and official capacities. Sheriff Hilty is sued only in his official

---

[7] The EMTs were called within thirty minutes of Plaintiff's arrest and after he had arrived at the jail. (*See* Doc. 59-2 at 29, Tr. 105:24-106:2 (EMS called at 7:15 PM); 30 at 110:17-18 (arrest time is 6:46 PM).)

4

capacity. Counts 1, 2, and 3 are state law claims against Deputy Tucker and Deputy Crook. Count 4 is a federal claim against St. Clair County and Sheriff Hilty seeking liability under *Monell v. Department of Social Services*, 463 U.S. 658 (1978). Count 5 is a federal claim against Deputy Tucker and Deputy Crook. The counts are as follows:

| Count | Claim | Defendant(s) |
|---|---|---|
| Count 1 | False Arrest (state law) | Deputy Tucker and Deputy Crook |
| Count 2 | Excessive Force and Deliberate Indifference (state law) | Deputy Tucker and Deputy Crook |
| Count 3 | Battery (state law) | Deputy Tucker and Deputy Crook |
| Count 4 | Failure to Train and Supervise (*Monell*) (42 U.S.C. § 1983) | St. Clair County and Sheriff Hilty |
| Count 5 | False Arrest, Excessive Force, Deliberate Indifference (42 U.S.C. § 1983) | Deputy Tucker and Deputy Crook[8] |

The Court addresses the three state-law claims first and then considers Plaintiff's federal constitutional claims under § 1983.

## I. State-Law Claims – Counts 1, 2, and 3

In the first three counts, Plaintiff asserts claims against Deputy Tucker and Deputy Crook for false arrest, excessive force and deliberate indifference, and battery. The deputies argue that they are entitled to various state-law immunities for the individual-capacity claims, including immunity under § 455.085, RSMo, as well as official immunity, and that the official-capacity claims are barred by sovereign immunity.

### A. State-Law Individual Capacity Claims

First, the Court addresses the state-law claims asserted against the deputies in their individual capacities. The deputies argue that they are entitled to immunity for any claim arising out of Plaintiff's arrest pursuant to § 455.085, RSMo, and that they are entitled to official immunity under Missouri state law as well.

---

[8] Although Plaintiff names "all defendants" in Count 5, the substance of the allegations are directed only towards Deputy Tucker and Deputy Crook. (*See* Doc. 1 at ¶¶ 86-89.)

## 1.      Statutory Immunity under Mo. Rev. Stat. § 455.085

The deputies argue that they are entitled to statutory immunity under § 455.085, RSMo, a provision within Missouri's Adult Abuse Act or domestic violence law.  Specifically, subsection 1 of § 455.085 provides as follows:

> When a law enforcement officer has probable cause to believe a party has committed a violation of law amounting to domestic violence, as defined in section 455.010, against a family or household member, the officer may arrest the offending party whether or not the violation occurred in the presence of the arresting officer.

§ 455.085.1.  Subsection 3 of § 455.085, RSMo, further provides that "[w]hen an officer makes an arrest, the officer is not required to arrest two parties involved . . . when both parties claim to have been assaulted," but the "party the officer believes is the primary physical aggressor [i.e., the "most significant, rather than the first aggressor"],'' should be arrested.  Finally, as relevant here, subsection 4 of § 455.085, RSMo, provides statutory immunity for officers "in any civil action alleging false arrest, false imprisonment, or malicious prosecution" "[i]n an arrest in which a law enforcement officer acted in good faith reliance on this section."[9]

Missouri law defines the following terms, as relevant to § 455.085, set out in § 455.010, RSMo:

(1) "domestic violence" means "abuse or stalking committed by a family or household member," Mo. Rev. Stat. § 455.010(5);

(2) "family" or "household member" means "any person related by blood or marriage," § 455.010(7); and

(3) "abuse" "includes but is not limited to . . . threats against a person who may be protected pursuant to this chapter," § 455.010(1).

The deputies argue that under the facts above, they had probable cause to arrest Plaintiff under § 455.085.1 and are therefore immune from suit.  For purposes of Plaintiff's state-law false-arrest claim asserted in Count 1, the Court agrees.  Section 455.085 provides statutory immunity from a state-law false arrest claim when an officer has probable cause to believe an individual has threatened a family member.  Based on the initial report by Baylee Wheeler and, more significantly,

---

[9] Although Deputy Tucker and Deputy Crook appear to assert that they are entitled to statutory immunity under § 455.085 as to each of Plaintiff's state-law claims for false arrest (Count 1), excessive force (Count 2), and battery (Count 3), nothing in the statute suggests that it applies to separate claims of excessive force or battery, even if they arise out of an arrest under § 455.085.1.

the second phone call from Plaintiff to Cotton that was personally witnessed by Deputy Tucker in which Plaintiff verbally threatened to kill Cotton, the Court finds that the deputies had probable cause to arrest Plaintiff under § 455.085. The deputies are therefore immune from suit (in their individual capacities) for a state-law claim of false-arrest under § 455.085.

### 2. Official Immunity

In addition to statutory immunity as addressed above, the deputies also argue that they are entitled to official immunity for each state-law claim asserted against them in their individual capacities. In Missouri, "[o]fficial immunity . . . protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. banc 2019) (internal quotation marks omitted). Said another way, the doctrine of official immunity "protects a public official from liability if that official acts within the course of his official duties and without malice." *Id.*

Plaintiff presents two theories why Deputy Tucker and Deputy Crook are not entitled to official immunity as to the state-law claims for false arrest, excessive force and deliberate indifference, and battery.[10] First, Plaintiff suggests that the doctrine of official immunity does not apply as to these state-law claims to the extent the deputies violated his constitutional rights. He suggests that the deputies "do not have the discretion to ignore the Constitution and Plaintiff's rights that flow from it," and therefore official immunity does not apply. The single case Plaintiff cites in support of this argument, *Boever v. Special School District of St. Louis County*, 296 S.W.3d 487 (Mo. Ct. App. 2009), is, however, inapposite.

In *Boever*, the Missouri Court of Appeals explained that "the official immunity doctrine does not provide public employees immunity for acts committed when acting in a ministerial capacity." *Id.* at 492. This means that official immunity does not apply as to a claim arising out of a public employee's acts which, functionally, are acts "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety

---

[10] Although not addressed by the parties, the Court is somewhat unclear whether Missouri law recognizes as a separate or independent tort the claims for "excessive force" or "deliberate indifference" asserted by Plaintiff in Count 2. Nevertheless, assuming that Count 2 asserts *some* cognizable cause of action or tort under Missouri state law, the Court considers whether official immunity would apply—the only issue raised and discussed by the parties as to Count 2 in particular.

of the act to be performed." *Id.* Thus, *Boever* simply recognizes the ministerial-act exception to official immunity as a reciprocal to the general rule that "official immunity applies to all discretionary acts except those done in bad faith or with malice." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. banc 1986).[11]

Whether the ministerial-act exception to state-law official immunity applies focuses on the "task" or "act" performed itself and whether the nature of the "task" or "act" includes *any* level of discretion. *See State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 495-96 (Mo. banc 2024) (recognizing that "[t]he central inquiry is not whether the law confers a duty to act, but, instead, whether the public official retains *any* discretion in completing an act," and that "the pertinent inquiry is whether the nature of the act itself is ministerial or clerical" (internal quotation marks omitted)). More significantly, the Eighth Circuit, predicting how Missouri courts would address this question, has expressly rejected Plaintiff's argument that "official immunity does not apply because [the defendant's] actions were not within [his] legitimate discretion because they violated the Constitution." *Austell v. Sprenger*, 690 F.3d 929, 939 n.5 (8th Cir. 2012) (applying *Southers v. City of Farmington*, 263 S.W.3d 603, 614-17 (Mo. banc 2008). Plaintiff does not cite to any legal authority indicating that Missouri courts have recognized that official immunity does not apply when the alleged acts violate the Constitution. The Court does not consider this argument further.

Second, Plaintiff suggests that Deputy Tucker and Deputy Crook "acted with malice or bad faith," which he argues is necessarily a question for the jury to decide at trial. (Doc. 59 at 36.) As indicated above, "official immunity does not apply to discretionary acts done in bad faith or with malice." *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005); *see Twiehaus*, 706 S.W.2d at 446. "Bad faith or malice generally requires actual intent to cause injury." *Blue*, 170 S.W.3d at 479. This requirement generally refers to "a dishonest purpose, moral obliquy, conscious wrongdoing, a breach of a known duty through some ulterior motive," or actions or conduct "so reckless or wantonly and willfully in disregard of one's rights that a trier of fact could infer from such conduct bad faith or an improper or wrongful motive." *N.S. ex rel. Lee*

---

[11] The Missouri Court of Appeals in *Boever* found that the doctrine of official immunity applied to to a claim for wrongful death arising out of the alleged failure of a teacher and classroom aids to appropriately monitor and supervise a special needs child. 296 S.W.3d at 492 (finding that "plaintiffs did not allege the existence or breach of any statutory or regulatory duty, and therefore have not alleged facts establishing that an exception to the official immunity doctrine applies," and additionally finding that "a failure to act" is an exercise of discretion for purposes of the official immunity doctrine).

*v. Kansas City Bd. of Police Comm'rs*, 35 F.4th 1111, 1115 (8th Cir. 2022) (internal quotation marks omitted; quotation modified). Plaintiff does not present evidence of either, here. *See id.* ("speculation and conjecture are insufficient to defeat summary judgment" (internal quotation marks omitted)).

Plaintiff relies on his allegations that the deputies violated his constitutional rights. However, as explained below, the Court finds that the deputies did not violate Plaintiff's constitutional rights and are entitled to qualified immunity as to the federal constitutional § 1983 claims asserted by Plaintiff. *Cf. Jones v. City of St. Louis*, 599 F. Supp. 3d 806, 821 (8th Cir. 2022) (denying summary judgment on official-immunity grounds for state-law claim after denying qualified immunity for constitutional excessive-force claim, reasoning that "a reasonable jury could interpret the evidence to conclude each of the Defendants personally participated in the use of excessive force against Plaintiff" and "that the officers engaged in conduct so recklessly or wantonly and willfully in disregard of Plaintiff's rights that it permits an inference of bad faith" (internal quotation marks omitted; quotation modified)).

Plaintiff was arrested after Baylee Wheeler reported that Plaintiff had threatened her husband (Plaintiff's step-son, Cotton). While investigation Baylee's report, Deputy Tucker directly observed a second phone call from Plaintiff to Cotton during which Plaintiff threatened to kill Cotton. Plaintiff generally argues that the deputies "ignored exculpatory information" and arrested Plaintiff anyway. The "material exculpatory information" cited by Plaintiff, however, consists of (1) Sheriff Hilty's "pre-incident knowledge" based on Cotton's phone call to Sheriff Hilty, and (2) that the deputies "knew that Cotton Wheeler had initiated the underlying confrontation by calling Plaintiff first." (Doc. 57 at 27.) Plaintiff points to no evidence that the deputies had any knowledge about Cotton's phone call to Sheriff Hilty, however, other than that Sheriff Hilty had advised Deputy Crook that "the Suzie/Ron situation was brewing." Furthermore, during their investigation, Deputy Tucker personally witnessed Plaintiff's separate and independent phone call to Cotton Wheeler in which Plaintiff levied direct threats against Cotton.

Plaintiff also cites dash camera video which records Deputy Crook discussing that Cotton Wheeler had "filled out a request for prosecution" but that regardless, they "maybe . . . could get [Plaintiff] on harassment." (Doc. 59-8 (video); Doc. 59-3 at 12-13, Tr. 41:10-42:6.) The Court is not persuaded that, in context, Deputy Crook's discussion of potential charges or prosecution

9

demonstrates bad faith or malice, particularly where the arrest was lawful under § 455.085 and, as discussed more fully below, the deputies had probable cause to effect the arrest.

Additionally, as to the other claims, the evidence shows that the deputies restrained Plaintiff in handcuffs after he refused (at least initially) Deputy Tucker's request to remove his firearm and began escalating and then reached for his gun after Deputy Tucker had unholstered her own firearm. The deputies physically restrained Plaintiff to secure him in handcuffs after Plaintiff reached for his gun and pulled away from Deputy Crook when he grabbed Plaintiff's arm. Then, while being patted down by Deputy Crook before being placed in Deputy Tucker's vehicle, Plaintiff resisted Deputy Crook's attempts to remove Plaintiff's phone from his back pocket and turned to face the deputies, all while he was in handcuffs. In response, Deputy Crook turned Plaintiff around by pushing against his arm and pushing his body into the vehicle. Finally, as to Plaintiff's medical-treatment claim, Plaintiff was provided medical evaluation for his complaints of chest pain and trouble breathing after arriving at the jail shortly after his arrest and was taken to the hospital for observation and further evaluation, although EKG testing was negative for a heart attack.

In short, without identifying any "specific evidence of bad faith on the part" of either Deputy Tucker or Deputy Crook with regard to arresting Plaintiff (and effecting the arrest) or transporting Plaintiff to jail and then securing medical treatment, the deputies are entitled to official immunity (in their individual capacities) on summary judgment. *See Reasonover v. St. Louis County*, 447 F.3d 569, 585-86 (8th Cir. 2006) (affirming district court's finding that officers were entitled to official immunity as to state-law negligence claim absent "specific evidence of bad faith on the part of any of the officers").

### B. State-Law Official-Capacity Claims

As to the three state-law claims asserted against the deputies in their official capacities, the deputies argue that sovereign immunity applies.

It is axiomatic that Plaintiff's official-capacity claims against the deputies are the same as asserting a claim directly against St. Clair County. Under Missouri law, political subdivisions—including St. Clair County—are generally immune from state-law tort claims. *See Davis v. Buchanan County*, 5 F.4th 907, 909 (8th Cir. 2021); Mo. Rev. Stat. § 537.600. Missouri law also recognizes that a county may waive sovereign immunity if it purchases liability insurance for tort claims made against the county for claims that are covered by such insurance. *See Davis*, 5 F.4th

at 909 (recognizing Mo. Rev. Stat. § 537.610); *Div. of Emp. Sec'y, Mo. v. Bd. of Police Comm'rs*, 864 F.3d 974, 980 n.4 (8th Cir. 2017) (recognizing that state sovereign immunity may be waived where a political subdivision has obtained insurance but that such waiver applies only "up to but not beyond the policy limit and only for acts covered by the policy"). Plaintiff has the burden to prove the existence of an insurance policy and that the terms of the policy cover his claims. *See Nine v. Wentzville R-IV Sch. Dist.*, No. 4:11-CV-353 (CEJ), 2011 WL 3665368, at *2 (E.D. Mo. Aug. 22, 2011).

Plaintiff attached to his summary judgment response what he contends is a liability insurance policy obtained by St. Clair County. (Doc. 59-14.) He asserts that "[t]his insurance coverage constitutes a waiver of sovereign immunity under Missouri law for claims falling within the policy limits." (Doc. 59 at 37.) As Defendants point out, however, the policy as submitted by Plaintiff includes a "Sovereign Immunity Non-Waiver Endorsement," which expressly limits coverage for "any loss, occurrence, accident, wrongful act, . . . claim or suit for which any insured would otherwise have an exemption or have no liability because of sovereign immunity" and that "[n]othing in this policy, coverage part or coverage form waives sovereign immunity for any insured." (Doc. 59-14 at 24.) Missouri courts have held that "an express non-waiver provision in a liability insurance policy purchased by a governmental entity defeats any waiver of sovereign immunity . . . ." *Hendricks v. Curators of Univ. of Mo.*, 308 S.W.3d 740, 744 (Mo. Ct. App. 2010) (collecting cases); *see Parish v. Novus Equities Co.*, 231 S.W.3d 236, 246 (Mo. Ct. App. 2007) (recognizing that "a public entity retains its full sovereign immunity when an insurance policy contains a disclaimer stating that the entity's procurement of the policy was not meant to constitute a waiver of sovereign immunity").

Because the insurance policy proffered by Plaintiff (the sole argument on which he relies for waiver of sovereign immunity) contains a non-waiver provision, the state-law claims asserted in Counts 1-3 against Deputy Tucker and Deputy Crook in their official capacities are barred by sovereign immunity.

### C. Conclusion

Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Counts 1-3, asserting state-law claims against Deputy Tucker and Deputy Crook in both their individual and official capacities.

11

## II. Federal Civil Rights Claims – Counts 4 and 5

In addition to his state-law claims, Plaintiff also seeks damages under 42 U.S.C. § 1983 based on the same core theories as the state-law claims for false arrest, excessive force, and deliberate indifference. In Count 4, Plaintiff seeks to impose liability for violation of his constitutional rights under *Monell* (municipal liability) against St. Clair County and Sheriff Hilty for failing to supervise/train. In Count 5, Plaintiff asserts claims under § 1983 against Deputy Crook and Deputy Tucker for violating his federal constitutional rights.

### A. Section 1983 Claims against Deputy Tucker and Deputy Crook in their Individual Capacities (Count 5)

Plaintiff asserts various claims for violation of his constitutional rights under § 1983, including the Fourth and Fourteenth Amendments to the U.S. Constitution against Deputy Tucker and Deputy Crook in their individual capacities for false arrest (or arrest without probable cause), excessive force, and deliberate indifference to a serious medical need. The deputies argue that they are entitled to qualified immunity as to each of Plaintiff's constitutional civil rights claims.[12]

### 1. Qualified Immunity Legal Standard

When a plaintiff brings a § 1983 claim against a defendant in their individual capacity, the defendant may assert the doctrine of qualified immunity as an affirmative defense to suit. The doctrine of qualified immunity "shields police officers from lawsuits based on official conduct if reasonable officers in the same position could have believed their conduct was lawful, in light of clearly established law and the information the officers possessed at the time." *Waters v. Madson*, 921 F.3d 725, 734-35 (8th Cir. 2019) (internal quotation marks omitted). To overcome a defendant's assertion of qualified immunity as to a § 1983 claim, a plaintiff must demonstrate *both* "(1) a violation of his statutory or constitutional rights, and (2) that the right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 735 (internal quotation marks omitted); *see Davitt v. Spindler-Krage*, 96 F.4th 1068, 1071 (8th Cir. 2024). If a plaintiff

---

[12] Plaintiff brings this lawsuit against Deputy Tucker and Deputy Crook in both their "personal and professional capacities." (Doc. 1 at ¶¶ 4, 5.) Qualified immunity applies only to individual capacity claims and not to official capacity claims. Official capacity claims are essentially claims against the government entity itself (here, St. Clair County). It is unclear whether Counts 4 (*Monell* liability) and Count 5 are duplicative in this regard. Nevertheless, the Court first addresses the constitutional claims asserted against Deputy Tucker and Deputy Crook in their individual capacities (and whether they are entitled to qualified immunity), and then considers Plaintiff's *Monell* claims (encompassing claims against Deputy Tucker and Deputy Crook in their official capacities).

fails to show *either* that his constitutional rights were violated *or* that the asserted constitutional right was not clearly established at the time of the defendant's alleged misconduct, qualified immunity applies. *See Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (recognizing that a court "may not deny qualified immunity without answering both questions in the plaintiff's favor").

**2.    Fourth Amendment False Arrest Claim**

First, Plaintiff alleges that Deputy Tucker and Deputy Crook violated his Fourth Amendment rights by arresting him without probable cause.

Under the Fourth Amendment, a warrantless arrest must be supported by probable cause. *See Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) ("A warrantless arrest is unreasonable and violates the Fourth Amendment unless it is supported by probable cause.") "An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011) (internal quotation marks omitted). "To determine if there is probable cause, courts must examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *Nieters*, 83 F.4th at 1105 (internal quotation marks omitted); *see Devenpeck v. Alford*, 543 U.S. 146, (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). And even if there is not actual probable cause for an arrest, a law enforcement officer "is entitled to qualified immunity if there is at least arguable probable cause," which means that qualified immunity applies if an officer's mistaken belief that he had probable cause to effect the arrest "is objectively reasonable." *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017) (internal quotation marks omitted).

Plaintiff primarily argues that the deputies violated his constitutional rights by ignoring exculpatory information and conducting a reckless or incomplete investigation. As the Eighth Circuit has recognized, "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause [to effect an arrest] exists." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). "Second, and relatedly, law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect . . . ." *Id.* Thus, "probable cause does not exist when a

13

minimal further investigation would have exonerated the suspect." *Id.* (internal quotation marks omitted).

In addition to § 455.085, Missouri's Adult Abuse Act, the Court notes that under Missouri law, "[a] person commits the offense of harassment in the second degree if he . . . without good cause, engaged in any act with the purpose to cause emotional distress to another person." Mo. Rev. Stat. § 565.091.1. As discussed above, the "exculpatory information" which Plaintiff cites primarily refers to "pre-incident knowledge" of Sheriff Hilty arising from Cotton's phone call to the sheriff. Plaintiff does not point to any evidence that either Deputy Tucker or Deputy Crook had any knowledge about the specifics of this phone call or Sheriff Hilty's "pre-incident knowledge," other than Sheriff Hilty advising Deputy Crook that "the Ron/Suzie situation was brewing." Similarly, Plaintiff admits that at the time of the arrest, the deputies did not have direct knowledge of the specific communications that may have occurred during the initial phone call, such as whether Cotton Wheeler threatened to kill Plaintiff and his dogs. Plaintiff suggests that the deputies conducted a constitutionally deficient investigation because they knew that "Cotton Wheeler had initiated the underlying confrontation by calling Plaintiff first and criticizing him about not giving his mom enough money," and suggesting that the threats Plaintiff levied on the second phone call were simply made in response to Cotton's first phone call. (Doc. 59 at 27, 28.)

It is undisputed that after the deputies were first unable to make contact with Plaintiff at his property, the deputies were told by the Wheelers only that Plaintiff had threatened Cotton Wheeler and were not aware that Cotton had made any similar threat directed towards Plaintiff. (Doc. 59-2 at 10, Tr. 30:15-18.) While the deputies were conducting their investigation of the reported threats, Plaintiff initiated a separate phone call with Cotton Wheeler, while the deputies were present with Cotton, in which he was particularly "graphic" and "insulting" and stated that he would kill Cotton Wheeler if Cotton came onto his property, "in addition to other things." (Doc. 59-2 at 11, Tr. 35:16-24; 17, Tr. 59:8.) The deputies had been advised after speaking with Cotton and his family, that on the first call, Plaintiff made threats as well. (*Id.* at 18, Tr. 62:21-22.)

The Court finds that under these facts the deputies had probable cause to believe that Plaintiff had committed second degree harassment and to arrest Plaintiff under § 455.085.1 for making a threat against a family member as defined under Missouri's Adult Abuse Act.[13]

---

[13] This analysis would equally apply to Plaintiff's state-law false-arrest claim even if § 455.085.1

Plaintiff's remaining arguments—suggesting that the deputies should have "consider[ed] his side of the story" and pointing out that no charges were filed—do not change this analysis. First, the deputies "had no duty to conduct further investigation once they had (arguable) probable cause to arrest." *Clayborn v. Struebing*, 734 F.3d 807, 809 (8th Cir. 2013). Based on the totality of the circumstances—notably including Plaintiff's second phone call to Cotton Wheeler while the deputies were present with Cotton—the deputies had (arguable) probable cause to arrest Plaintiff. Second, that Plaintiff was never charged with a crime has no bearing on whether the total facts and circumstances known at the time could lead a reasonable objective officer to believe Plaintiff had committed a crime. *See also United States v. Houston*, 548 F.3d 1151, 1154 (8th Cir. 2008) ("The fact that Houston was ultimately charged with possession, as opposed to DUI [for which he had been arrested], does not impact the lawfulness of the arrest.").

Accordingly, the Court finds that Deputy Tucker and Deputy Crook (in their individual capacities) are entitled to qualified immunity as to Plaintiff's Fourth Amendment false arrest claim.

### 3. Excessive Force Claim

Second, Plaintiff asserts a Fourth Amendment claim for excessive force. Constitutional claims for excessive force against an arrestee are analyzed "under the Fourth Amendment and its reasonableness standard, assessing whether [the officers'] actions were objectively reasonable in light of the facts and circumstances confronting them." *Cameron v. City of Des Moines*, 168 F.4th 522, 527 (8th Cir. 2026) (internal quotation marks omitted; quotation modified). In general, each "discrete use of force" employed by law enforcement officers is subject to analysis under the Fourth Amendment for excessive use of force. *Blazek v. Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014).

In the context of qualified immunity, "[t]here, of course, is no question that the use of objectively unreasonable force violates the Fourth Amendment." *Boudoin v. Harsson*, 962 F.3d 1034, 1039 (8th Cir. 2020). To overcome qualified immunity, however, and to demonstrate that

---

did not apply. *See also State v. Johnson*, 354 S.W.3d 627, 634 n.6 (Mo. banc 2011) (the question of probable cause to make an arrest considers whether "the facts and circumstances within the police officer's knowledge, and of which they have reliable and trustworthy information, would warrant a person of reasonable caution to believe that the person being arrested had committed the offense," and noting that "[p]robable cause need not rise to the level of actual guilty" of having committed a crime (internal quotation marks omitted)).

the "clearly established" prong is satisfied in a Fourth Amendment excessive-force case, "a plaintiff must generally identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id.* (internal quotation marks omitted; quotation modified). The "factual specificity" required in the Fourth Amendment excessive-force qualified-immunity context—which generally requires caselaw "that involves sufficiently similar facts to squarely govern the officer's actions"—ensures that "state actors are not [held] liable for bad guesses in gray areas," but that they are instead held "liable for transgressing bright lines." *Id.* at 1039, 1040 (internal quotation marks omitted; quotation modified). In other words, to avoid qualified immunity, a plaintiff "must identify controlling authority or a robust consensus of cases of persuasive authority placing the constitutional question beyond debate," that is whether existing law "establish[es] a right to be free from" the particular uses of force employed in a given situation. *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (internal quotation marks omitted).

As best as the Court can discern, Plaintiff's excessive-force claim relies on three discrete alleged uses of force: (1) Deputy Tucker unholstering her gun, (2) the physical force employed by the deputies to secure Plaintiff in handcuffs, and (3) Deputy Crook "slamm[ing]" Plaintiff into the patrol vehicle twice after he was already secured in handcuffs. (Doc. 59 at 30 (discussing the "sequence of events demonstrating excessive force").) Plaintiff did not satisfy his burden to demonstrate that the deputies' alleged conduct and the force employed at each stage was clearly established as a constitutional violation under the circumstances. Summary judgment on qualified immunity is warranted on this ground alone. *See Rudley*, 935 F.3d at 655; *Lewis v. City of St. Louis*, 932 F.3d 646, 649 (8th Cir. 2019). Nonetheless, the Court also finds that the deputies did not violate Plaintiff's constitutional rights against excessive force under the Fourth Amendment.

Deputy Tucker personally witnessed Plaintiff threaten Cotton Wheeler's life verbally over the phone. When the deputies subsequently located and made contact with Plaintiff on his property, Plaintiff was armed. Plaintiff refused Deputy Tucker's request to disarm himself and immediately began escalating. Deputy Tucker—in the context of investigating Plaintiff's threats toward Cotton Wheeler, which included Plaintiff explicitly threatening to kill Cotton and Plaintiff's refusal to disarm and his escalating behavior—unholstered her own firearm in response without pointing it at Plaintiff. (Doc. 59-5 at 8, Tr. 29:1-2.) Plaintiff then reached for his gun (as

16

he testified, to comply with Deputy Tucker's earlier request to disarm himself, (*id.* at 9, Tr. 31:17-20), and the deputies moved to physically restrain Plaintiff.

Plaintiff testified that Deputy Tucker "knocked me around" and that Deputy Crook "run in and jerked my arm back, slammed me into the [side of] the Polaris Ranger," and secured him in handcuffs. (*Id.*, Tr. 31:20-24.) Plaintiff pulled away from Deputy Crook when the deputy grabbed his arm. "Even if [Plaintiff]'s motive" in carrying his firearm and then in reaching for his gun (after initially refusing to disarm) "was innocent, the deputies on the scene reasonably could have interpreted [Plaintiff]'s actions as resistance and responded with an amount of force that was reasonable to effect the arrest." *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012); *see Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) (recognizing that law enforcement officers have "the right to use *some degree* of physical coercion . . . to effect an arrest").

Next, Plaintiff alleges that after he was restrained in handcuffs, Deputy Crook "slammed him into the patrol vehicle twice." (Doc. 59 at 30.) As recounted above, this portion of the sequence of events was recorded on dash camera video. The video only shows Deputy Crook physically pushing Plaintiff into or against the side of the police vehicle one time, not twice as Plaintiff alleges. *See* note 6, above. The context is important.

The dash camera video captures Plaintiff, at that point secured in handcuffs, as he is walked back to Deputy Tucker's vehicle. Deputy Crook places Plaintiff against the vehicle and begins to conduct a pat-down search. While Deputy Crook is attempting to search him, Plaintiff turns his head to talk at the deputies and then physically resists as Deputy Crook tries to remove Plaintiff's phone from his back pocket. Plaintiff blocks Deputy Crook from removing the phone from his back pocket with his hand. Plaintiff then turns himself around to face the deputies, at which point Deputy Crook grabs Plaintiff's right arm to turn him back and physically pushes Plaintiff's abdomen or chest against or into the vehicle. Immediately after, Plaintiff is placed in the back of Deputy Tucker's vehicle. "In assessing a claim of excessive force, courts ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Lombardo v. City of St. Louis*, 594 U.S. 464, 466 (2021) (internal quotation marks omitted). The Court finds that Deputy Crook's use of force was not constitutionally excessive.

Accordingly, the Court finds that Deputy Tucker and Deputy Crook (in their individual capacities) are entitled to qualified immunity as to Plaintiff's Fourth Amendment excessive force.

17

### 4. Deliberate Indifference

Finally, Plaintiff asserts a constitutional claim for deliberate indifference for Deputy Tucker's failure to obtain professional medical evaluation when Plaintiff complained of chest pain and trouble breathing until after being transported to the jail. Under the Fourteenth Amendment's due process clause, an arresting officer may violate an arrestee's constitutional rights if he or she is deliberately indifferent to an arrestee's "objectively serious medical need." *See Stewart v. Garcia*, 139 F.4th 698, 710 (8th Cir. 2025).[14]

Plaintiff suggests that the symptoms he complained of—primarily, chest pain and shortness of breath—"are classic signs of a heart attack" that "[e]ven a layperson would recognize," and that Deputy Tucker violated his constitutional rights by her "conscious decision not to summon immediate medical assistance . . . ." (Doc. 59 at 32, 33.) It is undisputed that Plaintiff complained of chest pain and shortness of breath after being placed in Deputy Tucker's car and while en route to the jail. (*See* Doc. 59 at 18, ¶ 36.) Plaintiff argues that "[t]he delay in providing medical care increased the risk of harm to Plaintiff and caused him to suffer serious injury." (*Id.* at 34.)

In the Eighth Circuit, "the effect of a delay in treatment [should] be considered when evaluating the existence of an objectively serious medical need," particularly in a delay-of-treatment context. *Hancock v. Arnott*, 39 F.4th 482, 486 (8th Cir. 2022). A diagnosis or "other medical evidence that establishes detrimental effects of the alleged delay in treatment" is critical. *Bailey v. Feltmann*, 810 F.3d 589, 594 (8th Cir. 2016). It is undisputed that while Plaintiff was subsequently taken to the hospital after evaluation by EMTs at the jail, he was admitted only for further observation and evaluation and was not diagnosed with having a heart attack. Plaintiff left the hospital the next morning without further treatment.

In *Bailey*, the Eighth Circuit found that a plaintiff, Shane Bailey, failed to raise a submissible case for trial whether a Jefferson County, Missouri Sheriff's Department deputy violated his constitutional rights by denying medical care after responding to a personal-injury 911 call. Bailey, angry after leaving a friend's house, punched the driver's side mirror and windshield

---

[14] While a constitutional claim for deliberate indifference of a serious medical need is analyzed under the Fourteenth Amendment for an arrestee or pre-trial detainee (rather than under the Eighth Amendment for an inmate), the Eighth Circuit has noted that courts should "rely[] on both Fourteenth and Eighth Amendment cases alike." *Stewart*, 139 F.4th at 708.

of his truck, cutting his right hand. *Bailey*, 810 F.3d at 591. He called 911 after driving away in his truck but running out of gas. *Id.* Paramedics arrived at the scene first. *See id.* By the time the deputy arrived at the scene, the paramedics had bandaged Plaintiff's hand. *Id.* The deputy observed that blood was soaking through the bandages. *Id.* Bailey was arrested for careless driving and possessing alcohol as a minor. *Id.* at 592. Bailey told the deputy he had punched the window and windshield of his car. *Id.* at 591-92. Although the paramedics advised the deputy that Bailey's right hand needed sutures and that he needed to be taken to the ER, the deputy "believed that the paramedics' treatment of Bailey's hand was sufficient, and he drove Bailey directly to the county jail." *Id.* Blood continued to soak through the bandage, although Bailey did not complain or request additional medical treatment. *Id.* at 592.

After being released from jail the next morning, Bailey went to the ER where the wound was cleaned and glass removed. *Id.* The physician could not suture the cuts, however, because "the skin was 'too rotted' to stitch." *Id.* Bailey alleged that he suffered continued pain in his right hand due to the injury, although it only occurred rarely and that he did not miss time for work. *Id.* Bailey brought a § 1983 claim against the deputy based on the deputy's decision to transport him to the jail rather than the hospital.

On appeal, the Eighth Circuit held first that without any "physician's diagnosis or other medical evidence that establishes detrimental effects of the alleged delay in treatment" or that the "modest effects" he suffered from the injury "would have been avoided if [the deputy] had brought Bailey to a hospital at the time of his arrest," Bailey did not establish an "objectively serious medical need for expeditious treatment." *Id.* at 594. Second, the Eighth Circuit addressed Bailey's argument that "his serious need for prompt medical treatment should have been obvious to a layperson," particularly in light of the paramedic's statement that Bailey needed sutures and to go to the emergency room as well as the blood soaking through his bandages. *Id.* The Eighth Circuit found that neither the paramedic's statement nor the blood-soaked bandages satisfied this standard, finding that "[t]he circumstances apparent to [the deputy] at the time of arrest were not so dramatic that a layperson easily would have recognized an obvious need for immediate care by a physician." *Id.*

The Court finds *Bailey* is instructive here. Plaintiff has not provided any evidence that the delay in treatment adversely affected his prognosis or resulted in any lasting effects or injury. And in fact, it is undisputed that Plaintiff was provided medical evaluation after arriving at the jail,

19

which objectively only showed Plaintiff was tachycardic. Moreover, while Plaintiff was admitted to the hospital after being evaluated in the ER, he was only admitted for further observation and evaluation because of his increased heart rate and an "upward trend" in troponin levels; the ER EKG was otherwise negative for a heart attack. It is undisputed that Plaintiff left the hospital the next morning without further treatment. Plaintiff's complaints of chest pain and shortness of breath after being placed in Deputy Tucker's vehicle and arrested are no more dramatic than Bailey's blood-soaked bandages and glass-cut hand for which the treating paramedics on the scene advised ER treatment was necessary to get the cuts sutured closed.

The Court finds that Deputy Tucker and Deputy Crook (in their individual capacities) are entitled to qualified immunity as to Plaintiff's Fourteenth Amendment deliberate indifference claim.

> **B.** *Monell* **Liability (Count 4 – asserted against St. Clair County and Sheriff Hilty, and Count 5 – asserted against Deputy Tucker and Deputy Crook in their official capacities)**

It is well-established in this circuit that "in order for municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc) (internal quotation marks omitted); *see Malone v. Hinman*, 847 F.3d 949, 955-56 (8th Cir. 2017) (holding that, "[b]ecause we conclude that Officer Hinman did not violate Malone's constitutional rights, there can be no § 1983 or *Monell* liability on the part of Chief Thomas and the City"). Because the Court finds that Plaintiff's constitutional rights were not violated, summary judgment as to his *Monell* claims is warranted as well.

**Conclusion**

After careful consideration and review, and for the reasons explained above, the Court **ORDERS** that Defendants' motion for summary judgment, (Doc. 58), is **GRANTED**.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 21, 2026

20